STATE OF NORTH CAROLINA v. JARVIS LEON WILLIAMS

No. COA10-58

(Filed 7 December 2010)

**Constitutional Law— right to confrontation—lab results**

A defendant's Sixth Amendment right to confrontation was violated where lab results were presented by a forensic chemist who did not herself perform the tests on which her testimony was based, nor was she present when those tests were performed. Cross-examination was important to expose, among other things, the care or lack of care with which a chemist conducted tests.

Appeal by defendant from judgments entered 1 September 2009 by Judge Calvin E. Murphy in Mecklenburg County Superior Court. Heard in the Court of Appeals 13 September 2010.

*Roy Cooper, Attorney General, by Daniel D. Addison, Special Deputy Attorney General, for the State.*

*Don Willey for defendant-appellant.*

MARTIN, Chief Judge.

Defendant was indicted upon charges of possession with intent to sell or deliver cocaine and of having attained the status of an habitual felon. Defendant pled not guilty.

At trial, the evidence tended to show that on 2 April 2008, a confidential informant told Sergeant Brian Scharf that a black male named Jarvis was selling cocaine from the front porch of 429 Heflin Street. The informant told the officer that the cocaine was located in a hanging flower pot. Sergeant Scharf and Officer Gilliland responded to the tip by driving to 429 Heflin Street, where they saw defendant sitting on the front porch. They also observed a hanging flower pot. Sergeant Scharf saw a small plastic bag sticking out of the flower pot. He handcuffed defendant and searched him. During the search of defendant, he found and collected $195 in small denominations. He retrieved the bag out of the flower pot. The bag contained a substance which Sergeant Scharf believed to be crack cocaine.

At the police station, defendant made the following statement to the police:

[t]he cocaine that Officer Scharf found at 429 Heflin Street was put there by a black male named Chris. He put it there to sell it. When I got there, Chris told me the cocaine was there so I could sell it for him until he got back. I sold about thirty or forty dollars worth today. The cocaine was not mine. The cocaine was in a clear plastic bag in a flower pot hanging from the porch ceiling.

Sergeant Scharf testified that, during the course of his eleven-year employment at Charlotte Mecklenburg Police Department (CMPD), he had received training in the identification of drugs and controlled substances. He had been trained to identify crack cocaine "[b]y the way it looks, by the way it's shaped, by the way it's packaged, the color." He testified that crack cocaine has "a certain smell to it because it's made with powder cocaine chemicals, bringing it together to make it a hard substance to be able to ingest it by smoking it." He stated that he has identified substances and then had lab results confirming his identifications that were "accurate a hundred percent of the time." Scharf testified that, over the course of his career, he had participated in "[o]ver a thousand" drug and narcotic arrests—between three quarters and two thirds of which involved crack cocaine—and that each time, he observed the substance. He testified that he believed that the substance seized from the flower pot in the present case was crack cocaine.

Officer Gilliland testified that, during the course of his eight year employment at CMPD, he had also received training in identifying substances and drug paraphernalia. He testified that he had been directly involved in approximately 75 arrests that involved cocaine or crack cocaine. He then testified that "Scharf retrieved the baggie from the flower pot, which had crack cocaine in it." Gilliland confirmed that he had been able to observe the bag's contents.

At trial, over defendant's objection, CMPD crime lab forensic chemist Ann Charlesworth detailed the process that chemists in the lab follow when testing substances. She explained that forensic chemists first conduct a preliminary color test on a substance, and then extract a small amount of the substance to put with a solvent in a GC Mass Spec instrument. Charlesworth testified that in this case a color test was done twice and a GC Mass Spec test was done once. She testified that these are the same tests that she and other experts in her field reasonably rely upon when forming an opinion as to the weight and nature of substances.

Charlesworth explained that the GC Mass Spec generates a graphical result which a forensic chemist must interpret. Chemists look at retention time, which is specific for each chemical substance, and the graphical result from the GC Mass Spec, in order to see how well the graph matches the known standard for the substance.

Once a chemist has completed his or her analysis of a substance, all cases are then peer reviewed. In explaining what is done during a peer review, Charlesworth testified:

> I look at a worksheet and see what the description of the item was, how much the item weighed, and what tests were conducted. And then I also look at the instrument printouts from the GC Mass Spec, and I interpret those and see if I agree with the results that the chemist came up with, and then I look at the report and make sure it looks to be correct.

Charlesworth stated that she conducted the same type of review that she would have had she been the peer-reviewer. She agreed with the original forensic chemist, DeeAnne Johnson, "that from the printouts from the GC Mass Spec that the cocaine did come out, and it chemically matche[d] with the cocaine standard . . . in [the] library."

On cross-examination, it was clarified that Charlesworth herself did not analyze the substance itself. Nor was Charlesworth present on 16 September 2008 when the tests were run. Charlesworth also did not generate her own report. Rather, she explained that it was her role to assure that Johnson followed the protocol and procedures to correctly analyze the substance.

On 1 September 2009, the jury found defendant guilty of possession with intent to sell and/or deliver cocaine. Defendant then pled guilty to being an habitual felon. He was sentenced to 107 to 138 months' imprisonment.

---

Defendant appeals, arguing that the testimony of Charlesworth violated his Sixth Amendment right to confrontation. We agree.

This Court reviews alleged violations of constitutional rights *de novo*. *State v. Tate,* 187 N.C. App. 593, 599, 653 S.E.2d 892, 897 (2007). Under the *de novo* standard of review, this Court "considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re Appeal of the Greens of Pine Glen Ltd. P'ship,* 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003) (citing *Mann Media, Inc. v. Randolph Cty. Planning Bd.,* 356 N.C. 1, 13, 565 S.E.2d 9, 17 (2002)).

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Our Court in *State v. Brewington*, —— N.C. App. ——, 693 S.E.2d 182 (2010), recently traced the lineage of the Confrontation Clause as it applies to situations where a chemist testifies to a "peer review" of tests done by other chemists. *See id.* at ——, 693 S.E.2d at 187-88 (discussing *State v. Galindo*, —— N.C. App. ——, 683 S.E.2d 785 (2009), *State v. Mobley*, —— N.C. App. ——, 684 S.E.2d 508 (2009), *disc. review denied*, 363 N.C. 809, 692 S.E.2d 393 (2010), *State v. Davis*, —— N.C. App. ——, 688 S.E.2d 829 (2010), *State v. Hough*, —— N.C. App. ——, 690 S.E.2d 285 (2010), and *State v. Brennan*, —— N.C. App. ——, 692 S.E.2d 427 (2010)). After discussing the development of this line of cases, the *Brewington* Court noted that:

> [c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well. Serious deficiencies have been found in the forensic evidence used in criminal trials. Like expert witnesses generally, an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination.
>
> . . . [T]he purpose of requiring the analysts themselves testify is so that their honesty, competence, and the care *with which they conducted the tests* in question could be exposed to testing in the crucible of cross-examination. Thus, to allow a testifying expert to reiterate the conclusions of a non-testifying expert would eviscerate the protection of the Confrontation Clause.

*Id.* at ——, 693 S.E.2d at 189 (internal quotation marks and citations omitted). The Court then went on to describe a four-pronged test which applies in these cases:

> (1) determine whether the document at issue is testimonial; (2) if the document is testimonial, ascertain whether the declarant was unavailable at trial and defendant was given a prior opportunity to cross-examine the declarant; (3) if the defendant was not afforded the opportunity to cross-examine the unavailable declarant, decide whether the testifying expert was offering an independent opinion or merely summarizing another non-testifying expert's report or analysis; and (4) if the testifying expert summarized another non-testifying expert's report or analysis, determine whether the admission of the document through another testifying expert is reversible error.

*Id.*

Turning now to the present case, it is clear that the report detailing the tests done by Johnson and then "peer reviewed" and testified about by Charlesworth is testimonial. *See Melendez-Diaz v. Mass.*, —— U.S. ——, ——, 174 L. Ed. 2d 314, 321 (2009) (notingthat testimonial evidence includes " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' ") (quoting *Crawford v. Washington*, 541 U.S. 36, 52, 158 L. Ed. 2d 177, 193 (2004)). Moreover, there is nothing in the record supporting any conclusion that defendant was given the opportunity to cross-examine Johnson.

This brings us to the third prong of the test: determining whether Charlesworth was offering an independent opinion or merely summarizing Johnson's report. Defendant argues that Charlesworth merely summarized Johnson's results, thus making this a case similar to *Brennan*, —— N.C. App. at ——, 692 S.E.2d at 431 (holding that testimony from the non-testing chemist eroded the defendant's constitutional rights and that the defendant was entitled to a new trial), or *Brewington*, —— N.C. App. at ——, 693 S.E.2d at 191 (holding that testimony from a chemist who conducted no independent analysis of the substance was admitted in error and defendant was therefore entitled to a new trial). The State, on the other hand, analogizes Charlesworth's testimony to the testimony given in *Mobley*, —— N.C. App. at ——, 684 S.E.2d at 511-12 (holding that there was no error when the testifying DNA analyst testified to her own independent analysis which was merely based on the analysis of the testing analyst). The State argues that Charlesworth did not merely restate Johnson's results but "reviewed the underlying report to determine if Ms. Johnson had followed all standard testing protocols . . . [and] the data on which Ms. Johnson's conclusions were based [in order to] form her own expert opinion about the composition of the suspected cocaine."

The present case is distinguishable from *Mobley*. In *Mobley*, the testifying expert compared the DNA profile from a buccal swab taken from the defendant to the DNA profile taken from a vaginal swab of the victim. *Mobley*, —— N.C. App. at ——, 684 S.E.2d at 511. The expert then testified "not just to the results of other experts' tests, but to her own technical review of those tests, her own expert opinion of the accuracy of the non-testing experts' tests, and her own expert opinion *based on a comparison of the original data*." *Id.* (emphasis

added). In the present case, on the other hand, Charlesworth did not even see the original substance.

The State also relies upon *Hough*, —— N.C. App. at ——, 690 S.E.2d at 291 (holding that there was no error where a testifying chemist provided her own analysis and expert opinion regarding the accuracy of a testing chemist's report based on her "peer review"). The difficulty that this Court finds with making a distinction between *Hough*, pointed to by the State on the one hand, and *Brennan* and *Brewington*, to which defendant directs us on the other hand, is that, despite their different holdings, the testimony given by Charlesworth was substantively the same as the testimony given by the expert in all three of those cases. The *Brewington* Court drew a narrow distinction in order to explain the "no error" holding in *Hough* by noting that, "[d]espite the fact that the testifying expert in *Hough* did not conduct the tests on the contraband in issue, we concluded that the testifying expert conducted a 'peer review' of her colleague's work." *Brewington*, —— N.C. App. at ——, 693 S.E.2d at 188. The *Brewington* Court cautioned that it was not the holding of *Hough* "that every 'peer review' will suffice to establish that the testifying expert is testifying to his or her expert opinion; however, [in *Hough*, the expert's] testimony was sufficient to establish that her expert opinion was based on her own analysis of the lab reports." *Id.* (quoting *Hough*, —— N.C. App. at ——, 690 S.E.2d at 291).

While the relevancy of a "peer review" of underlying lab reports which themselves are not admitted for the truth of the matter asserted may be questioned, *Brewington* correctly emphasizes the importance of cross-examination as a tool to expose, among other things, the care (or lack thereof) with which a chemist conducted tests on a substance. *Brewington*, —— N.C. App. at ——, 693 S.E.2d at 189.

With this in mind, we turn to the present case and note that Charlesworth did not conduct any tests on the substance, nor was she present when Johnson did. We think that these facts are decisive and show that Charlesworth could not have provided her own admissible analysis of the relevant underlying substance. *See State v. Craven*, —— N.C. App. ——, ——, 696 S.E.2d 750, 755 (2010). We therefore now hold that Charlesworth's testimony detailing her "peer review" was merely a summary of the underlying analysis done by Johnson. Therefore admitting this testimony was error.

This brings us to the fourth prong of the test identified in *Brewington*, whether the admission of this hearsay testimony was

reversible error. The State bears the burden of proving the error was harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b) (2009) ("A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt.").

Defendant was charged with possession of cocaine, which requires the State to show beyond a reasonable doubt that the substance defendant possessed was actually cocaine. *See* N.C. Gen. Stat. § 90-95(a)(1) (2009). Besides Charlesworth's testimony as to the chemical composition of the substance seized, the only other evidence that the substance sold by defendant was in fact cocaine was the testimony of Officer Gilliland and Officer Scharf that the substance seized from the flower pot was cocaine and the statement given by the defendant that "Chris told me the cocaine was there so I could sell it for him until he got back. I sold about thirty or forty dollars worth today. The cocaine was not mine." The State contends that this evidence renders any error harmless. We disagree.

The testimony of defendant and police officers alone, despite both officers' credentials and experience, is insufficient to show that the substance possessed was cocaine. The State must still present evidence as to the chemical makeup of the substance. *State v. Nabors*, —— N.C. App. ——, ——, 700 S.E.2d 153, 158 (2010) ("[M]ere lay opinion that a substance is a controlled substance based solely on its physical appearance is insufficient evidence from which a jury could find beyond a reasonable doubt that the substance is, in fact, controlled."); *State v. Meadows*, —— N.C. App. ——, ——, 687 S.E.2d 305, 309 (" '[E]xisting precedent suggests that controlled substances defined in terms of their chemical composition can only be identified through the use of a chemical analysis rather than through the use of lay testimony based on visual inspection.' ") (quoting *State v. Ward*, —— N.C. App. ——, ——, 681 S.E.2d 354, 371 (2009), *aff'd*, 364 N.C. 133, 694 S.E.2d 738 (2010)), *cert. denied*, 364 N.C. App. 245, 699 S.E.2d 640 (2010); *State v. Llamas-Hernandez*, 189 N.C. App. 640, 653, 659 S.E.2d 79, 87 (2008) (Steelman, J., concurring in part and dissenting in part), *rev'd and dissent adopted*, 363 N.C. 8, 673 S.E.2d 658 (2009).

Because we conclude that this error was not harmless, defendant is entitled to a

New trial.

Judges STROUD and ERVIN concur.