IN THE SUPREME COURT OF NORTH CAROLINA

No. 533PA10

FILED 27 JUNE 2013

STATE OF NORTH CAROLINA

       v.

JARVIS LEON WILLIAMS


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 208 N.C. App. 422, 702 S.E.2d 233 (2010), finding prejudicial error in a judgment entered on 1 September 2009 by Judge Calvin E. Murphy in Superior Court, Mecklenburg County, and ordering that defendant receive a new trial. Heard in the Supreme Court on 12 February 2013.

> *Roy Cooper, Attorney General, by Amy Kunstling Irene and Daniel P. O'Brien, Assistant Attorneys General, for the State-appellant.*
>
> *Don Willey for defendant-appellee.*


PARKER, Chief Justice.

The issue in this case is whether the Court of Appeals erred by granting defendant a new trial on the basis that defendant's Sixth Amendment Confrontation Clause rights were violated. For the reasons stated herein, the decision of the Court of Appeals is reversed.

Defendant was arrested following a brief investigation that resulted in the discovery of cocaine in a flower pot near where defendant was standing. Defendant

was indicted for possession with intent to sell or deliver cocaine and attaining habitual felon status. The jury convicted defendant of the cocaine charge, and defendant thereafter admitted his habitual felon status. The trial court entered judgment sentencing defendant to 107 to 138 months of imprisonment. At the conclusion of the trial proceedings, defendant orally entered his notice of appeal to the Court of Appeals.

At trial the State's evidence tended to show the following: On 2 April 2008, Sergeant Brian Scharf of the Charlotte-Mecklenburg Police Department (CMPD) received a telephone call from a confidential informant stating that a black male wearing all black and having long dreadlocks was selling cocaine from the porch of 429 Heflin Street. The informant said the cocaine would be in a flower pot hanging from the porch ceiling. Sergeant Scharf and Officer James Gilliland drove to the reported location, where they observed defendant, who matched the description provided by the informant. The officers also observed a flower pot hanging from the porch ceiling. Sergeant Scharf asked defendant if defendant had been selling crack cocaine, and defendant denied that he had been doing so. Both officers saw a clear plastic bag sticking out of the flower pot. Based on Sergeant Scharf's experience as a narcotics officer, he knew that clear plastic bags are the predominant means of packaging illegal narcotics. Sergeant Scharf handcuffed defendant, retrieved the bag from the flower pot, and then observed inside the bag a substance that, based

on his training and experience, he believed to be crack cocaine.  Sergeant Scharf also searched defendant, finding $195 in cash in his pocket.

The officers transported defendant to the police station, where they interviewed him after he waived his *Miranda* rights.  Defendant said that a man named Chris had left the crack cocaine there for him to sell and that he had sold some that day.  Sergeant Scharf prepared a written statement to that effect, which defendant reviewed and signed.  The written statement declared:

> The cocaine that officer Scharf found at 429 Heflin St was put there by a black male named "Chris."  He put it there to sell it.  When I got there "Chris" told me the Cocaine was there so I could sell it for him until he got back. I sold about $30.00–40.00 worth today.  The Cocaine was not mine.  The Cocaine was in a clear plastic bag in a flower pot hanging from the porch ceiling.

The State presented Ann Charlesworth of the CMPD Crime Laboratory as an expert in forensic chemistry.  Charlesworth testified that the crime lab is accredited.  Charlesworth also testified to the crime lab's standard practices and procedures.  Specifically, she testified to procedures regarding the chain of custody of suspected controlled substances, the chemical analysis of suspected controlled substances, the recording and reporting of chemical analysis results and conclusions, and the peer review process to review the results and conclusions of the chemical analysis.

Charlesworth testified that after an analyst receives a substance to be tested, the analyst subjects it to two rounds of testing:  a preliminary test followed

by a confirmatory test.  The preliminary test is generally a "color test."  There are different color tests for different controlled substances.  A positive test result for a color test designed for a specific controlled substance indicates that the tested substance is likely to be the specific controlled substance for which the test is designed.  Once a positive color test result is obtained, a confirmatory test is conducted using a gas chromatograph mass spectrometer (GC Mass Spec).  The data from the GC Mass Spec would then be compared with a standard from the crime lab's library to determine if the substance is the substance suggested by the color test.

The crime lab's procedures require analysts to record the results of their analysis and their conclusions in a specific manner.  The results of the color test are manually entered into a Chemistry Drug Worksheet, and the machine-generated results produced by the GC Mass Spec are printed.  Analysts enter their conclusions as to the identity of the tested substances in a lab report, which is used by "the police and the attorneys."  The Drug Chemistry Worksheet, the GC Mass Spec printout, and the lab report are placed in a file that corresponds to the case at issue.

The crime lab's procedures also mandate peer review of an analyst's results and conclusions.  Once an analyst has completed a file, the analyst transfers the file to another analyst, who reviews the entire file to see if that analyst comes to the same conclusion.  The second analyst then initials and dates the file to indicate concurrence with the results.

Charlesworth was asked to review for trial the file corresponding to the substance seized by Sergeant Scharf. DeeAnne Johnson, a chemist who no longer works for the crime lab, performed the analysis of the substance recovered from the flower pot. Charlesworth did the same type of review that she would have done if she had been the peer reviewer. The tests performed by Johnson were "the same tests that [Charlesworth] and other experts in the field reasonably rely upon as to forming an opinion as to the weight and nature of the substance tested." After Charlesworth described her review of the file, the prosecutor asked:

> [B]ased on your training and experience in the field of forensic chemistry and your course of your employment at CMPD and in Pennsylvania and your review of this case file, did you form your own expert opinion as to the substance that was present and the weight in this case?

Over defendant's objection, Charlesworth declared, "The substance was cocaine and it was 0.99 grams."

Next, the prosecutor moved to admit the Drug Chemistry Worksheet, the GC Mass Spec printout, and the lab report into evidence "as illustrative of Ms. Charlesworth's opinion in this case." Over defendant's objection, the trial court admitted the exhibits "for the purpose of illustrating the testimony of this witness in establishing what she relied upon in formulating her own opinion about the evidence in this case." The trial court instructed the jury that it "may consider [the exhibits] for that purpose, or those purposes, and only that purpose."

Defendant testified on his own behalf. Defendant testified that on 2 April 2008 he went to 429 Heflin Street. Defendant stated he knew that drug selling, prostitution, and gambling went on at that house. On the porch, defendant met a black male who said his name was Chris. Defendant testified that Chris repeatedly asked defendant to sell crack cocaine for him, but defendant refused each time. Before Chris left the house, he told defendant that the drugs were in the flower pot, gave defendant twenty dollars, and said, "[M]ake a sale for me until [I get] back." According to defendant, shortly after Chris left, a man pulled up in a truck asking for Chris. Defendant told the man that Chris had left. Then defendant "got the drugs" from the flower pot and gave the man the drugs in exchange for forty dollars. Defendant testified that as soon as the man in the truck left, Sergeant Scharf and Officer Gilliland pulled up to the house. Defendant testified that while being interviewed by Sergeant Scharf after waiving his *Miranda* rights, he said, "[T]he cocaine in the flower pot wasn't mine, it was a guy named Chris." Defendant also informed Sergeant Scharf that he "wasn't intending on selling any cocaine that day, and [he] was tricked by Chris."

As noted above, the jury convicted defendant of the cocaine charge, and defendant thereafter admitted his habitual felon status. On appeal to the Court of Appeals, defendant argued that Charlesworth's testimony regarding the results of a chemical analysis performed by Johnson violated his rights guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution.

Relying heavily on its analysis of the Confrontation Clause in *State v. Brewington*, 204 N.C. App. 68, 693 S.E.2d 182 (2010), *rev'd,* ___ N.C. ___, ___ S.E.2d ___ (2013) (No. 235PA10), the unanimous court below reasoned that admission of Charlesworth's testimony was error. *State v. Williams*, 208 N.C. App. 422, 427, 702 S.E.2d 233, 237-38 (2010). Specifically, the Court of Appeals reasoned that because "the report detailing the tests done by Johnson and then 'peer reviewed' and testified about by Charlesworth is testimonial," "nothing in the record support[s] any conclusion that defendant was given the opportunity to cross-examine Johnson," and "Charlesworth's testimony detailing her 'peer review' was merely a summary of the underlying analysis done by Johnson," admission of the testimony at issue was error. *Id.* at 426-27, 702 S.E.2d at 236-38. The court below next determined that the error was not harmless beyond a reasonable doubt and granted defendant a new trial. *Id.* at 427-28, 702 S.E.2d at 238. The court reasoned that without Charlesworth's testimony as to the chemical composition of the substance seized, the State did not meet its burden of "present[ing] evidence as to the chemical makeup of the substance." *Id.* at 428, 702 S.E.2d at 238 (citing, *inter alia*, *State v. Nabors*, 207 N.C. App. 463, 471, 700 S.E.2d 153, 158 (2010), *rev'd*, 365 N.C. 306, 718 S.E.2d 623 (2011)). On 4 October 2012, this Court allowed the State's petition for discretionary review.

Before this Court the State argues that the Court of Appeals erred by holding that there was a Confrontation Clause violation since Charlesworth testified to her

own opinion about the identity of the controlled substance based on the data and report of another expert analyst and the report itself was admissible as the basis for the testifying expert's opinion. The State further argues that the Court of Appeals erred in that any error was harmless beyond a reasonable doubt. We agree with the State that even if admission of the testimony and exhibits at issue was error, any error was harmless beyond a reasonable doubt. Accordingly, we reverse the Court of Appeals without addressing whether defendant's Sixth Amendment rights were violated.

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b) (2011). Defendant's trial testimony was not that the substance was not cocaine, but rather that "the cocaine in the flower pot wasn't mine" and Chris had tricked him into selling it. Because defendant testified in his own defense that the seized substance was cocaine and that he had been selling it, any alleged error in admitting Charlesworth's testimony and the related exhibits was harmless beyond a reasonable doubt. *See State v. Nabors*, 365 N.C. 306, 312-13, 718 S.E.2d 623, 627 (2011).

For the reasons stated herein, the decision of the Court of Appeals is reversed.

REVERSED.


Justice BEASLEY dissenting.


For the reasons stated in my dissent in *State v. Brewington*, ___ N.C. ___, ___ S.E.2d ___ (2013), I respectfully dissent.  I would affirm the decision of the Court of Appeals granting defendant a new trial.  I would hold that, as prohibited by the Confrontation Clause under *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705 (2011), the expert testimony in this case amounts to mere surrogate testimony being used to explicitly introduce critical evidence of an element of the charged offense, and that this constitutional violation was not harmless beyond a reasonable doubt.  The majority relies on *State v. Nabors*, 365 N.C. 306, 718 S.E.2d 623 (2011), to hold that defendant's use of the word "cocaine" alleviates any error presented by the failure to offer a competent expert witness to confirm the identity of the substance at issue.  *Nabors* directly conflicts with the rulings in *State v. Llamas-Hernandez*, 363 N.C. 8, 673 S.E.2d 658 (2009) (per curiam), and *State v. Ward*, 364 N.C. 133, 694 S.E.2d 738 (2010).  As such, *Nabors* should be narrowly construed. Contrary to the majority's position, this case does not fall within the narrow bounds of *Nabors*.

This case is distinguishable from *Nabors* in several respects.  First, the

standard of review in *Nabors* was different from that presented here. In *Nabors* this Court reviewed for plain error. 365 N.C. at 311-13, 718 S.E.2d at 626-27. Thus, the burden was on the defendant to prove that the jury probably would have reached a different result absent the error. *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). This case, however, requires review under the harmless beyond a reasonable doubt standard.

> When violations of a defendant's rights under the United States Constitution are alleged, harmless error review functions the same way in both federal and state courts: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." In other words, an error under the United States Constitution will be held harmless if "the jury verdict would have been the same absent the error." Under both the federal and state harmless error standards, the government bears the burden of showing that no prejudice resulted from the challenged federal constitutional error.

*Id.* at 513, 723 S.E.2d at 331 (alteration in original) (citations omitted). Thus, here the *State* bears the burden to show that *no* harm resulted from the error. The difference between these standards is marked and is determinative here.

Second, *Nabors* involved an appeal from the trial court's denial of defendant's motion to dismiss for insufficient evidence on the bases that the State failed to provide chemical testing and that all identification was based on lay opinion testimony by the officers. 365 N.C. at 310-11, 718 S.E.2d at 626-27. Part of this review mandates that "both competent and *incompetent* evidence that is favorable

to the State . . . be considered by the trial court in ruling on a defendant's motion to dismiss." *Id.* at 312, 718 S.E.2d at 627 (emphasis added) (citations omitted). By contrast, the challenge here asserts a Confrontation Clause violation—the deprevation of a fundamental right. We do not need to, and in fact should not, consider incompetent evidence in determining whether defendant suffered *any* harm as a result of this violation of his constitutional right to confrontation.

Under the standard of review in *Nabors*, the Court held that the lay witness testimony by defendant's friend that the substance was cocaine was "an independent basis for upholding the trial court's denial of the motion." *Id.* at 313, 718 S.E.2d at 627. While one might assume this to be the same as stating that it is sufficient to provide lay witness testimony regarding the chemical identity of the crack cocaine at issue here, the Court then directly knocked this assumption down by declaring that it would *not* decide whether testing is required. *Id.* The Court in *Nabors* found it unnecessary to do so precisely because the standard of review was plain error: "Assuming arguendo that admission of the lay testimony was error, defendant cannot satisfy his burden of showing plain error inasmuch as his own evidence established that the substance sold was cocaine." *Id.* Because this case does not involve plain error review, motions to dismiss, or consideration of incompetent evidence, this Court must declare whether chemical testing is required. As I discuss in my dissent in *Brewington*, this declaration has already been made by this Court in *State v. Ward.*

In *State v. Ward* this Court extended the requirement of chemical testing to verify the identity of any alleged controlled substance. 364 N.C. at 143-44, 694 S.E.2d at 744-45. While the facts in *Ward* specifically addressed tablets, the language used to state the rule and the rationale behind the rule apply generally to controlled substances governed by N.C.G.S. § 90-95. *Id.* Specifically, this Court expressed concern regarding counterfeit substances, which are subject to a lesser punishment by statute:

> By imposing criminal liability for actions related to counterfeit controlled substances, the legislature not only acknowledged that their very existence poses a threat to the health and well-being of citizens in our state, but that a scientific, chemical analysis must be employed to properly differentiate between the real and the counterfeit. . . . As such, a scientifically valid chemical analysis of alleged controlled substances is critical to properly enforcing the North Carolina Controlled Substances Act.

364 N.C. at 143-44, 694 S.E.2d at 745.

To hold defendant accountable for his belief that the substance in question was indeed cocaine directly nullifies the rationale presented in *Ward* that a substance may be alleged to be either real or counterfeit, but in fact be the opposite. Accordingly, defendant's belief whether a substance is real or counterfeit is irrelevant to the State's burden. When the State is required to provide evidence of chemical testing to verify the identity of a substance but fails to comply with the Confrontation Clause, a defendant's belief or assertion that the drug is real cannot,

under the precedent of this Court, make the error harmless. The submission of chemical testing through the proper expert's testimony would determine the severity of the defendant's sentence irrespective of his belief regarding the chemical identity of the substance.

This finding that an error would not be harmless, of course, begs the question of whether defendant's Sixth Amendment right to confrontation was violated. Consistent with my dissenting opinion in *Brewington*, I submit that it was. Just as in *Brewington*, here the State presented a surrogate expert to testify conclusively about which tests were actually performed, how they were actually performed, and the results they actually yielded, despite having never examined the substance in question herself. Further, the opinion the surrogate expert purported to independently convey depended upon visual observations not made by the surrogate herself, predominantly that the substance was of a particular weight. This testimony directly violates the rule in *Bullcoming*. ___ U.S. at ___, 131 S. Ct. at 2710 ("The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—*made for the purpose of proving a particular fact*—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement." (emphasis added)). In contrast to *Brewington*, however, but precisely consistent with *Bullcoming*, here the

report of the testing analyst was actually admitted into evidence, although under the pretense of serving as illustrative evidence of the surrogate expert's independent opinion. This is a most egregious violation of *Bullcoming* and of the Confrontation Clause. As discussed above, this violation could not be harmless because without any scientifically valid evidence regarding the chemical identity of the substance, the State is unable to show whether the substance in question was real or counterfeit, thus making the State unable to prove that defendant was guilty of the charged offense of felony possession of a controlled substance, as opposed to the lesser offense of felony possession of a counterfeit substance.

Lastly, this result does not conflict with *Nabors*. In *Nabors* this Court stated:

> While the State has the burden of proving every element of the charge beyond a reasonable doubt, when a defense witness's testimony characterizes a putative controlled substance as a controlled substance, the *defendant cannot on appeal escape the consequences of the testimony in arguing that his motion to dismiss should have been allowed.*

365 N.C. at 313, 718 S.E.2d at 627 (emphasis added) (citations omitted). There the consequences of the testimony were that incompetent evidence would be used against defendant and that the plain error standard would be applied. Here the consequences of the testimony are that defendant believed the substance was cocaine and that lay witness testimony was provided contending that the substance was actually cocaine. Defendant cannot escape these consequences. But these

consequences do not prove the element of possession of actual cocaine as required by this Court's precedent and enactments of the General Assembly. Although, defendant cannot escape that he assisted the State's case, neither may the State escape that it did not present competent evidence on an essential element of the crime. Because the burden falls on the *State* here, and not on the defendant—as it did in *Nabors*—this difference is sufficient to alter the outcome.