PARKER, Chief Justice.
*65 The issue in this case is whether the Court of Appeals erred by granting defendant a new trial on the basis that defendant’s Sixth Amendment Confrontation Clause rights were violated. For the reasons stated herein, the decision of the Court of Appeals is reversed.
Defendant was arrested following a brief investigation that resulted in the discovery of cocaine in a flower pot near where defendant was standing. Defendant was indicted for possession with intent to sell or deliver cocaine and attaining habitual felon status. The jury convicted defendant of the cocaine charge, and defendant thereafter admitted his habitual felon status. The trial court entered judgment sentencing defendant to 107 to 138 months of imprisonment. At the conclusion of the trial proceedings, defendant orally entered his notice of appeal to the Court of Appeals.
At trial the State’s evidence tended to show the following: On 2 April 2008, Sergeant Brian Scharf of the Charlotte-Mecklenburg Police Department (CMPD) received a telephone call from a confidential informant stating that a black male wearing all black and having long dreadlocks was selling cocaine from the porch of 429 Heflin Street. The informant said the cocaine would be in a flower pot hanging from the porch ceiling. Sergeant Scharf and Officer James Gilliland drove to the reported location, where they observed defendant, who matched the description provided by the informant. The officers also observed a flower pot hanging from the porch ceiling. Sergeant Scharf asked defendant if defendant had been selling crack cocaine, and defendant denied that he had been doing so. Both officers saw a clear plastic bag sticking out of the flower pot. Based on Sergeant Scharf’s experience as a narcotics officer, he knew that clear plastic bags are the predominant means of packaging illegal narcotics. Sergeant Scharf handcuffed defendant, retrieved the bag from the flower pot, and then observed inside the bag a substance that, based on his training and experience, he believed to be crack cocaine. Sergeant Scharf also searched defendant, finding $195 in cash in his pocket.
The officers transported defendant to the police station, where they interviewed him after he waived his Miranda rights. Defendant said that a man named Chris had left the crack cocaine there for him to sell and that he had sold some that day. Sergeant Scharf prepared a written statement to that effect, which defendant reviewed and signed. The written statement declared:
The cocaine that officer Scharf found at 429 Heflin St was put there by a black male named “Chris.” He put it there to sell it. *66 When I got there “Chris” told me the Cocaine was there so I could sell it for him until he got back. I sold about $30.00-40.00 worth today. The Cocaine was not mine. The Cocaine was in a clear plastic bag in a flower pot hanging from the porch ceiling.
The State presented Ann Charlesworth of the CMPD Crime Laboratory as an expert in forensic chemistry. Charlesworth testified that the crime lab is accredited. Charlesworth also testified to the crime lab’s standard practices and procedures. Specifically, she testified to procedures regarding the chain of custody of suspected controlled substances, the chemical analysis of suspected controlled substances, the recording and reporting of chemical analysis results and conclusions, and the peer review process to review the results and conclusions of the chemical analysis.
Charlesworth testified that after an analyst receives a substance to be tested, the analyst subjects it to two rounds of testing: a preliminary test followed by a confirmatory test. The preliminary test is generally a “color test.” There are different color tests for different controlled substances. A positive test result for a color test designed for a specific controlled substance indicates that the tested substance is likely to be the specific controlled substance for which the test is designed. Once a positive color test result is obtained, a confirmatory test is conducted using a gas chromatograph mass spectrometer (GC Mass Spec). The data from the GC Mass Spec would then be compared with a standard from the crime lab’s library to determine if the substance is the substance suggested by the color test.
The crime lab’s procedures require analysts to record the results of their analysis and their conclusions in a specific manner. The results of the color test are manually entered into a Chemistry Drug Worksheet, and the machine-generated results produced by the GC Mass Spec are printed. Analysts enter their conclusions as to the identity of the tested substances in a lab report, which is used by “the police and the attorneys.” The Drug Chemistry Worksheet, the GC Mass Spec printout, and the lab report are placed in a file that corresponds to the case at issue.
The crime lab’s procedures also mandate peer review of an analyst’s results and conclusions. Once an analyst has completed a file, the analyst transfers the file to another analyst, who reviews the entire file to see if that analyst comes to the same conclusion. The second analyst then initials and dates the file to indicate concurrence with the results.
*67 Charlesworth was asked to review for trial the file corresponding to the substance seized by Sergeant Scharf. DeeAnne Johnson, a chemist who no longer works for the crime lab, performed the analysis of the substance recovered from the flower pot. Charlesworth did the same type of review that she would have done if she had been the peer reviewer. The tests performed by Johnson were “the same tests that [Charlesworth] and other experts in the field reasonably rely upon as to forming an opinion as to the weight and nature of the substance tested.” After Charlesworth described her review of the file, the prosecutor asked:
[B]ased on your training and experience in the field of forensic chemistry and your course of your employment at CMPD and in Pennsylvania and your review of this case file, did you form your own expert opinion as to the substance that was present and the weight in this case?
Over defendant’s objection, Charlesworth declared, “The substance was cocaine and it was 0.99 grams.”
Next, the prosecutor moved to admit the Drug Chemistry Worksheet, the GC Mass Spec printout, and the lab report into evidence “as illustrative of Ms. Charlesworth’s opinion in this case.” Over defendant’s objection, the trial court admitted the exhibits “for the purpose of illustrating the testimony of this witness in establishing what she relied upon in formulating her own opinion about the evidence in this case.” The trial court instructed the jury that it “may consider [the exhibits] for that purpose, or those purposes, and only that purpose.”
Defendant testified on his own behalf. Defendant testified that on 2 April 2008 he went to 429 Heflin Street. Defendant stated he knew that drug selling, prostitution, and gambling went on at that house. On the porch, defendant met a black male who said his name was Chris. Defendant testified that Chris repeatedly asked defendant to sell crack cocaine for him, but defendant refused each time. Before Chris left the house, he told defendant that the drugs were in the flower pot, gave defendant twenty dollars, and said, “ [M]ake a sale for me until [I get] back.” According to defendant, shortly after Chris left, a man pulled up in a truck asking for Chris. Defendant told the man that Chris had left. Then defendant “got the drugs” from the flower pot and gave the man the drugs in exchange for forty dollars. Defendant testified that as soon as the man in the truck left, Sergeant Scharf and Officer Gilliland pulled up to the house. Defendant testi *68 fied that while being interviewed by Sergeant Scharf after waiving his Miranda rights, he said, “[T]he cocaine in the flower pot wasn’t mine, it was a guy named Chris.” Defendant also informed Sergeant Scharf that he “wasn’t intending on selling any cocaine that day, and [he] was tricked by Chris.”
As noted above, the jury convicted defendant of the cocaine charge, and defendant thereafter admitted his habitual felon status. On appeal to the Court of Appeals, defendant argued that Charlesworth’s testimony regarding the results of a chemical analysis performed by Johnson violated his rights guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution. Relying heavily on its analysis of the Confrontation Clause in State v. Brewington, 204 N.C. App. 68, 693 S.E.2d 182 (2010), rev’d,_N.C._,_S.E.2d_(2013) (No. 235PA10), the unanimous court below reasoned that admission of Charlesworth’s testimony was error. State v. Williams, 208 N.C. App. 422, 427, 702 S.E.2d 233, 237-38 (2010). Specifically, the Court of Appeals reasoned that because “the report detailing the tests done by Johnson and then ‘peer reviewed’ and testified about by Charlesworth is testimonial,” “nothing in the record supports] any conclusion that defendant was given the opportunity to cross-examine Johnson,” and “Charlesworth’s testimony detailing her ‘peer review’ was merely a summary of the underlying analysis done by Johnson,” admission of the testimony at issue was error. Id. at 426-27, 702 S.E.2d at 236-38. The court below next determined that the error was not harmless beyond a reasonable doubt and granted defendant a new trial. Id. at 427-28, 702 S.E.2d at 238. The court reasoned that without Charlesworth’s testimony as to the chemical composition of the substance seized, the State did not meet its burden of “present[ing] evidence as to the chemical makeup of the substance.” Id. at 428, 702 S.E.2d at 238 (citing, inter alia, State v. Nabors, 207 N.C. App. 463, 471, 700 S.E.2d 153, 158 (2010), rev’d, 365 N.C. 306, 718 S.E.2d 623 (2011)). On 4 October 2012, this Court allowed the State’s petition for discretionary review.
Before this Court the State argues that the Court of Appeals erred by holding that there was a Confrontation Clause violation since Charlesworth testified to her own opinion about the identity of the controlled substance based on the data and report of another expert analyst and the report itself was admissible as the basis for the testifying expert’s opinion. The State further argues that the Court of Appeals erred in that any error was harmless beyond a reasonable doubt. We agree with the State that even if admission of the testimony *69 and exhibits at issue was error, any error was harmless beyond a reasonable doubt. Accordingly, we reverse the Court of Appeals without addressing whether defendant’s Sixth Amendment rights were violated.
“A violation of the defendant’s rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.” N.C.G.S. § 15A-1443(b) (2011). Defendant’s trial testimony was not that the substance was not cocaine, but rather that “the cocaine in the flower pot wasn’t mine” and Chris had tricked him into selling it. Because defendant testified in his own defense that the seized substance was cocaine and that he had been selling it, any alleged error in admitting Charlesworth’s testimony and the related exhibits was harmless beyond a reasonable doubt. See State v. Nabors, 365 N.C. 306, 312-13, 718 S.E.2d 623, 627 (2011).
For the reasons stated herein, the decision of the Court of Appeals is reversed.
REVERSED.